UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 23-10053-DJC |
| REY DAVID FULCAR, | |
| Defendant | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through undersigned counsel, respectfully submits its Sentencing Memorandum for the Court's consideration in advance of sentencing of Defendant, Rey David Fulcar.  In light of the sentencing range contemplated in the United States Sentencing Commission's Guidelines Manual and the statutory sentencing factors set forth in Title 18, United States Code, Section 3553, the government recommends that Defendant be sentenced to 151 months imprisonment and 36 months supervised release.  For the reasons set forth herein, the recommended sentence is sufficient, but not greater than necessary, to achieve the goals of sentencing.

## BACKGROUND

### THE OFFENSE CONDUCT

As described in the revised Presentence Investigation Report ("PSR"), compiled by U.S. Probation and Pretrial Services ("Probation") on May 15, 2024, Defendant was arrested on July 23, 2022 in Boston, Massachusetts, and charged with state criminal violations for possessing multiple dangerous drugs for distribution, and for resisting arrest.  *See* PSR at ¶ 58.  The state proceedings, which were eventually dismissed following Defendant's initial appearance in federal court in the instant case, were predicated on a car stop and packaged quantities of drugs discovered

inside his underwear and the car. *Id*. However, a wider federal investigation exposed Defendant as a bona fide drug trafficker with all the usual accoutrements of that illicit trade: an alias, multiple telephones, cash on hand, and a base of operations and stash location, fortified by a .380 caliber handgun and ammunition.

A single day of surveillance and investigation hints at the scale of Defendant's drug trafficking activity. Within a mere two hours of beginning their surveillance of Defendant, investigators observed him leave his apartment, first briefly visit a drug-prone location, and then head directly to a drug deal. PSR at ¶¶ 11-12. Defendant sold his drug customer about half a gram of crack cocaine divided into three knotted plastic baggies. PSR at ¶ 14. Investigators stopped and arrested Defendant moments after he drove away from the deal. *Id*. They searched his car and his person. Later that day, they searched his apartment.

Inside Defendant's car, investigators found two cellular telephones, five large, shrink-wrapped packages of suspected marijuana, and $1,141 cash. PSR at ¶ 14.

Inside Defendant's underwear, investigators found 13 small plastic bags of cocaine and two small plastic bags of a mixture of fentanyl and cocaine. PSR at ¶ 15.

Inside Defendant's apartment, investigators found additional cocaine and fentanyl; Suboxone strips (containing the controlled substances buprenorphine and naloxone) and cash inside a shoebox; drug paraphernalia; a drug trafficking ledger; and a .380 caliber semi-automatic pistol with a magazine containing seven .380 caliber rounds of ammunition. PSR at ¶ 16.

In interviews with investigators, the drug customer revealed telling details about his relationship with Defendant. The drug customer claimed he knew Defendant by the name, "Jerry." *See* D.E. 98, Defendant's Sentencing Memorandum, Exhibit G at ¶ 13. He used one of Defendant's

telephone numbers to order crack cocaine from Defendant on a weekly basis.  PSR at ¶ 13.  He had been buying crack cocaine from Defendant for several months.  *Id.*

The evidence demonstrated that Defendant used the Quincy apartment as a base of operations and stash location for his drugs.  Distribution-level quantities of drugs were found throughout the apartment: in the bedroom, in the living room, and in the kitchen.  PSR at ¶ 16.  More than just drugs, the apartment contained all manner of indicia of drug trafficking: cash; a gun and ammunition to defend the stash and illicit proceeds; a cutting agent and residue-covered instruments for producing and processing the drugs; and a scale and plastic bags for packaging the drugs for distribution.  *Id.*  Moreover, Defendant maintained in the apartment a ledger to track and coordinate his drug tracking activities, such as customer orders and debts owed.  *Id.*  Consistent with a base of operations, Defendant traveled to conduct a drug deal almost immediately after leaving the apartment.  PSR at ¶¶ 11-12.

There are several indicators that Defendant is a savvy and experienced drug trafficker.  He employed an alias and used multiple telephone numbers.  He stashed multiple different types of drugs in his apartment.  Cognizant of the risks of driving while in possession of drugs, Defendant hid them in his underwear.  And he was notorious enough as a drug trafficker to warrant the need for a ledger.  Defendant's familiarity with the jargon and weights and measures of the drug trade is illustrated in the hand-written ledger with terms like "weed", "hard", "soft", "1/2", and "basket".  *See* Ex. 1 (close-up search warrant photograph of drug ledger).

Finally, the investigation revealed Defendant's connections in the criminal underworld.  As a drug trafficker, Defendant naturally has relationships with illegal narcotics suppliers.  Defendant also has historical associations with Boston street gangs.  PSR at ¶¶ 9, 76 & pp. 36, 48.  Investigators turned their attention to Defendant in part because of an alarming social media

dispute he had with another gang member.  PSR at ¶ 9.  A ballistics examination performed on the gun found in Defendant's apartment linked the weapon to two prior shootings in Boston.  PSR at ¶ 17.  Generally, weapons involved in criminal activity are not transferred in legal and regulated channels, or by law-abiding citizens; moreover, Defendant's criminal record presumably would have prevented him from acquiring the gun legitimately.  Therefore, Defendant's possession of the gun signals his access to the illegal gun market.

*PROCEDURAL HISTORY*

On March 1, 2023, a Grand Jury returned a three-count indictment naming Defendant.  *See* Indictment, Criminal No. 1:23-10053, Court's Electronic Case File, Docket Entry ("D.E.") 1.  Count One charged Defendant with being a felon in possession of firearm and ammunition, and Counts Two and Three charged Defendant with possessing with intent to distribute cocaine and fentanyl in Boston and his Quincy apartment, respectively, all on July 23, 2022.  A federal arrest warrant issued, and Defendant was taken into custody on March 3, 2023 at the Quincy apartment.  PSR at ¶ 2.

Defendant made his initial appearance in federal court the same day, and he was arraigned on the Indictment.  D.E. 10.  Defendant was held and subsequently detained pending trial on the government's motion.  *See* Order on Government's Motion for Detention, March 10, 2023, D.E. 17.  Defendant has remained in custody at the Wyatt Detention Facility since March 3, 2023, for the duration of these proceedings.  PSR at ¶ 5.

On December 20, 2023, the Court held a hearing pursuant to Rule 11 of the Federal Rules of Criminal Procedure.  D.E. 85; PSR at ¶ 3.  Defendant pled guilty to all three counts of the Indictment and admitted to facts sufficient for the sentencing enhancements found by Probation,

and discussed further herein.  *Id*.  The parties did not execute a plea agreement.  A sentencing hearing is currently scheduled for May 22, 2024.

On May 17, 2024, the government filed a Motion for Preliminary Order of Forfeiture for the $1,141 cash seized from Defendant on July 23, 2022.  D.E. 101.  The government also filed notice that it would not be seeking judicial forfeiture of the gun or ammunition recovered from Defendant's apartment, as the seizing agency has already completed administrative forfeiture proceedings for those items.  D.E. 99.

## THE ADVISORY SENTENCING GUIDELINES

The sentences and sentencing ranges dictated by the Sentencing Commission's Guidelines Manual ("USSG" or "the Guidelines") are advisory only.  *United States v. Booker,* 543 U.S. 220 (2005).  Nevertheless, the First Circuit has made clear that "the guidelines still play an important role in the sentencing procedure, so that [] a court should ordinarily begin by calculating the applicable guideline range."  *United States v. Gilman*, 478 F.3d 440, 445 (1st Cir. 2007).  Here, the government recommends a Guidelines sentence of 151 months, to be followed by 36 months supervised release.  Such a sentence falls at the low end of the sentencing range advised by the U.S. Sentencing Commission for Career Offenders and adequately accounts for Defendant's serious offense conduct in light of his significant criminal history, while also balancing the mitigating factors in Defendant's personal history and characteristics.  18 U.S.C. § 3553(a).

### *GUIDELINES CALCULATION*

The government agrees with Probation's analysis of Defendant's offense level under the 2023 Guidelines.

Counts Two and Three should be first grouped for Guidelines calculations pursuant to USSG §3D1.2(d) (Drug Counts), and then the Drug Counts may properly be grouped with Count

One pursuant to USSG §3D1.2(c) to calculate the combined offense level of all counts of conviction.  *See* PSR at ¶¶ 23-25.

Defendant is responsible for distributing between 20 kilograms and 40 kilograms of converted drug weight.  PSR at ¶ 26.  This weight corresponds to an offense level of 16.  USSG §2D1.1(c)(12).  The offense level is increased by two levels because a dangerous weapon was possessed.  USSG §2D1.1(b)(1).  Therefore, the offense level for the Drug Counts is 18.  PSR at ¶ 31.

Guideline Section 2K2.1 governs the analysis of Defendant's Count One offense level. The base offense level is 24 because he has two prior qualifying convictions for either a crime of violence or a controlled substance offense.  USSG §2K2.1(a)(2); *see* PSR at ¶¶ 25, 41, 44.  The offense level is increased by four levels because Defendant possessed a firearm and ammunition in connection with another felony offense (Counts Two and Three).  Therefore, the offense level for Count One is 28.  PSR at ¶ 25.

Defendant meets the qualifying criteria of a Career Offender under Guideline §4B1.1.  *See* USSG §4B1.1(a)(1)-(3); PSR at ¶¶ 32, 41, 44.  Because the statutory maximum term of imprisonment for Counts Two and Three is 20 years or more, but less than 25 years, Defendant's base offense level is 32.

The government does not object to Defendant receiving a three-level offense level reduction for acceptance of responsibility.  *See* USSG §3E1.1(a), (b); PSR at ¶¶ 33-34. Accordingly, Defendant's total offense level is 29.  PSR at ¶ 35.

The government also concurs with Probation's computation of Defendant's criminal history category and assignment to Category VI.  PSR at ¶¶ 38-48; *see* USSG §4B1.1(b).  The resulting Guidelines sentencing range, based upon a total offense level of 29, Criminal History

Category VI, yields the following Guidelines sentencing range: 151 months to 188 months imprisonment, *see* PSR at ¶ 85; a term of supervised release of 3 years, *see* PSR at ¶ 89; and a fine between $30,000 and $1,000,000.  *See* PSR at ¶¶ 93, 95; USSG §§5D1.2, 5E1.2.

      I.      *Defendant's Objections to the Guidelines Calculations*

Defendant lodged objections to the Guidelines sentencing range reached by both Probation and the government.  *See* PSR at pp. 38-46 (Objections #6 – #10).  The objections fall into two basic categories: i.) whether Defendant's 2008 conviction in Essex County Superior Court for Possession of Class B (Cocaine) with Intent to Distribute is a predicate "controlled substance offense" under the Guidelines, and ii.) the role his Count One conviction for being a Felon in Possession of a Firearm and Ammunition played in the offenses, particularly whether the gun possession is a specific offense characteristic that should enhance his offense level.  Because these objections would have the Court adopt positions diverging from both the facts and law, they should be rejected.

      A.      *Defendant's 2008 drug conviction is a "controlled substance offense"*
                   *(Objections #9 and #10)*

Defendant objects to Probation's Guidelines analysis because he does not believe his 2008 cocaine conviction meets the definition of a "controlled substance offense" as that term is defined in the Guidelines.  PSR at p 41-45 (Objection #9); *see* USSG §4B1.2(b).  The argument springs from the Supreme Court's categorical approach to evaluating prior "violent felony" convictions under the Armed Career Criminal Act in *Mathis v. United States*.  579 U.S. 500 (2016).  PSR at p 42-43 (Objection #9).  According to Defendant, it follows from *Mathis* that his 2008 cocaine conviction cannot *categorically* qualify as a Career Offender predicate conviction because Massachusetts defines the class of controlled substances that covers cocaine to include a substance – Ioflupane – that is now excluded from the federal Controlled Substances Act (hereinafter,

"CSA"), thus "sweeping more broadly" than corresponding federal law.  *Id.* at p 43 (Objection #9).[1]  And because Guidelines Section 2K2.1 cross-references Section 2B1.2 for its definition of "controlled substance offense," Defendant claims that the same conviction cannot properly be the basis to increase his base offense level to 24 under that Guideline.  *See id.* p 38-39 (Objection #6); USSG §2K2.1, comment. (n.1).

The key premise of Defendant's arguments – namely, that the Court should evaluate a state controlled substance offense with reference to the federal controlled substances schedule – is contrary to the plain meaning of Guidelines Section 4B1.2(b) and the weight of authority having previously considered this issue.  Consequently, the Court should dismiss his objections and adopt the same conclusion reached by Probation and advanced by the government here: Defendant's 2008 drug conviction is a "controlled substance offense" and a qualifying predicate conviction under both the Career Offender Guideline and Guidelines Section 2K2.1.

The Guidelines define "controlled substance offense" as:

> an offense under federal *or state law*, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance . . . or the possession of a controlled substance . . . with intent to manufacture, import, export, distribute, or dispense.

USSG §4B1.2(b) (emphasis added); *see also* USSG §4B1.2(e)(4) (defining "prior felony conviction" as a "prior adult federal *or state conviction* . . . . .") (emphasis added); *id.*, comment. (n.2) ("Section 4B1.1 (Career Offender) expressly provides that the instant and prior offenses must

---

[1] Mass. Gen. Laws. Ch. 94C, § 31(a)(4) includes in its definition of a Class B Controlled Substance "[c]ocoa leaves and any salt, compound, derivative, or preparation of cocoa leaves, and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, except that the substances shall not include decocainized leaves or extraction of cocoa leaves, which extractions do not contain cocaine or ecgonine." Ioflupane is derived from ecgonine, and the CSA previously included substances derived from ecgonine, including Ioflupane.  See 21 CFR 1308.12 (2000).  In 2015, however, at the request of the Department of Health and Human Services, the Drug Enforcement Administration removed Ioflupane from the schedules of the CSA.  See Schedules of Controlled Substances: Removal of [123 I] Ioflupane from Schedule II of the Controlled Substances Act, 80 Fed. Reg. 54715-01 (Sept. 11, 2015) (codified at 21 CFR pt. 1308).

be crimes of violence or controlled substances of which the defendant was convicted" – with no suggestion that prior offenses must be criminalized under both state and federal law). Importantly, this Guidelines section and its definitions explicitly employ the disjunctive in the context of qualifying prior convictions (*e.g.*, "federal or state law"). As recently and succinctly declared by the Eleventh Circuit, the plain text of the Guidelines "makes clear" that, for a prior state conviction, "a 'controlled substance' includes a substance that is regulated only by the law of the state of conviction." *United States v. Dubois*, 94 F. 4th 1284, 1296 (11th Cir. 2024). Accordingly, Massachusetts law can define what qualifies as a "controlled substance offense" for the purposes of Guidelines Section 4B1.2(b). *Id*.

Notwithstanding Defendant's assertions to the contrary, whether a state "controlled substance offense" can be a predicate conviction under the Guidelines does not depend on whether the offense criminalized under state law is also criminalized under federal law. Quite simply, there are three elements to the inquiry: i.) prior conviction of an offense criminalized under federal or state law; ii.) the law prohibited the manufacturing, importation, exportation, distribution, or dispensing of a controlled substance or the possession of a controlled substance with the intent to do the same; and iii.) the offense was punishable by a term of imprisonment greater than one year. USSG §4B1.2(b). Defendant's 2008 drug conviction satisfies all three elements.

The vast majority of appellate courts to consider the issue have concluded that a "controlled substance" within the Guideline Section 4B1.2(b) definition is one regulated by *either* federal or state law.[2] To date, the Third, Fourth, Sixth, Seventh, Eighth, Tenth, and Eleventh Circuits have

---

[2] The First Circuit has not yet addressed the question. *See United States v. Crocco*, 15 F. 4th 20, 23 (1st Cir. 2021) ("This Court has not weighed in on this debate and, given the posture of this appeal, will not do so now.").

each so held.[3]  *See Dubois*, 94 F. 4th at 1296-98 (11th Cir. 2024); *United States v. Jones,* 81 F. 4th

591, 597-600 (6th Cir. 2023), *pet'n for cert. filed* (No. 23-6118 Nov. 28, 2023); *United States v.*

*Lewis*, 58 F. 4th 764, 767-73 (3d Cir. 2023); *United States v. Jones,* 15 F. 4th 1288, 1291-96 (10th

Cir. 2021); *United States v. Henderson,* 11 F. 4th 713, 718-19 (8th Cir. 2021), *cert. denied,* 142 S.

Ct. 1696 (2022); *United States v. Ward,* 972 F. 3d 364, 373 (4th Cir. 2020); *United States v. Ruth,*

966 F. 3d 642, 651-54 (7th Cir. 2020).  Additionally, four judges – including this Court – have

adopted the same view.  *See United States v. Martinez*, Crim. No. 22-10031-AK, D.E. 753,

Electronic Clerk's Notes for Sentencing held on May 16, 2024; Sentencing Transcript in *United*

*States v. Craig*, Crim. No. 23-10194-PBS (D. Mass. Jan. 18, 2024), Exhibit 2 at 17-18; Sentencing

Transcript in *United States v. Coates*, Crim. No. 20-10136-RGS, at 3 (D. Mass. Oct. 18, 2023),

Exhibit 3 at 2-3; Sentencing Transcript in *United States v. Fleurantin*, Crim. No. 22-10267-DJC

(D. Mass. May 17, 2023), Exhibit 4 at 12-14.

 The Third Circuit's reasoning behind its interpretation of USSG §4B1.2(b) in *Lewis* is

particularly cogent.  *Lewis* addressed the same issue where the CSA defined a controlled substance

(in that case, marijuana) more narrowly than state law at the time of the defendant's conviction.

There, the CSA excluded hemp while state law included it in its definition.  According to the Third

Circuit, the analysis was different from the "typical" categorical approach; the proper inquiry was

not whether the prior conviction was for a certain offense, but whether the conviction meets the

Guidelines definition of "controlled substance offense" in Section 4B1.2(b).  58 F. 4th at 768,

citing *Shular v. United States*, 140 S. Ct. 779, 783 (2020).  Ultimately, that inquiry turned on

---

[3] In contrast, both the Second and Ninth Circuits have held that the meaning of "controlled substance" is limited to drugs regulated by the CSA.  *See United States v. Townsend*, 897 F. 3d 66, 74-75 (2d Cir. 2018); *United States v. Bautista*, 989 F. 3d 698, 702 (9th Cir. 2021); *see also United States v. Gonzalez-Alvarez*, 781 F. 3d 787, 792-94 (5th Cir. 2015) (relying on the CSA to interpret the term "controlled substance" in USSG §2L1.2); *but see United States v. Chaires*, No. 20-4162, 2023 WL 8461231, at *5-10 (2d Cir. Dec. 7, 2023) (Sullivan, J., concurring) (arguing that *Townsend* was wrongly decided and urging the Second Circuit "to correct this error through an *en banc* or mini *en banc* proceeding").

whether marijuana could be considered a "controlled substance" as used in the Section 4B1.2(b)'s definition of "controlled substance offense." *Id*.  The *Lewis* Court resolved the question by holding that the term "controlled substance offense" was not limited to drugs regulated by the federal CSA, and that the Guidelines set forth a clear definition of what constituted a "controlled substance" under USSG §4B1.2(b): "one regulated under state or federal law." *Id*. at 769

Like Defendant here, the *Lewis* defendant did not contest that his prior drug offense was an offense under state law punishable by a term of imprisonment greater than one year.  Rather, like Defendant, his argument focused on the discrepancy between the state and federal definitions of marijuana, which he claimed required the Third Circuit to ignore the prior conviction when calculating his offense level under Guidelines Section 2K2.1.  The *Lewis* court cited several reasons why the argument was "unpersuasive," *id*. at 770-71, including that the application of a categorical approach analysis "does not require, as [the defendant] and some courts have suggested, using a uniform drug schedule to define 'controlled substance,'" *id*. at 770, and that the commentary for Guidelines Section 4B1.2 did "not dictate a federal-law-only approach" when assessing whether a crime constituted a predicate offense.  *Id*.  Guided by its interpretation of "controlled substance" under USSG §4B1.2(b), the Third Circuit concluded that it was "irrelevant" that the state statute defined "marijuana" more broadly than federal law.  *Id*. at 771.

A few months after the Third Circuit's ruling in *Lewis*, the Sixth Circuit reached a similar conclusion in *Jones*.  81 F. 4th at 598-600.  In *Jones*, the Sixth Circuit agreed that the text of USSG §4B1.2(b) was clear, that it incorporated an explicit reference to "state law," and that it contained no textual limitation requiring "controlled substances" to be limited to those drugs covered by the CSA.  *Id*. at 598-599, n.5.  As the Sixth Circuit explained:

> What we don't see in the text is an imperative that the Controlled
> Substances Act serve as the referent for what state-law provisions

> can qualify as controlled substances offenses. In fact, we see §4B1.2(b) referencing "offense[s]" under "state law" in defining controlled substances offenses.

*Id*. at 598. The Sixth Circuit also observed that the Sentencing Commission explicitly referenced federal statutes or rules in certain Guidelines provisions, in contrast with Section 4B1.2(b), which explicitly incorporates references to both federal and state law. *Id*. Thus, the *Jones* court concluded that "the context of the Guidelines confirms what the text suggests – state law controlled substances offenses need not define controlled substances according to the Controlled Substances Act to count under §4B1.2(b)." *Id*.; *see also Chaires*, 2023 WL 8461231, at *7 (Sullivan, J., concurring) ("Put simply, if the Commission had wanted to limit 'controlled substance offense[s]' to those that mirror federal law, it knew full well how to do so.").[4]

Here, Defendant grapples unpersuasively with the commonsense approach taken by the balance of circuit Courts of Appeals and the judges of this District. As a threshold matter, Defendant asserts that Massachusetts criminalizes Ioflupane, a chemical derivative of ecgonine. PSR at p 42 (Objection #9). However, it is not clear that the Court can, on this record, conclude that the state definition of a Class B Controlled Substance unambiguously includes Ioflupane. The Massachusetts statute nowhere identifies Ioflupane explicitly, there has been no change in Massachusetts law that arguably criminalizes Ioflupane, and there have been no prosecutions in

---

[4] As Judge Sullivan discusses in his concurrence in *Chaires*, Guidelines Section 4B1.2(b) originally contained explicit reference to various provisions of the CSA. 2023 WL 8461231, at *7. Two years later, however, the Sentencing Commission deleted those cross-references, leaving Section 4B1.2(b) referencing both federal and state law. *Id*.

It is also notable that the Sentencing Commission distinguishes controlled substance offense from the statutory definition of "serious drug offense" contained in 18 U.S.C. § 924(e)(2), remarking that they are not coextensive. *See* USSG §4B1.4, comment. (n.1) ("It is to be noted that the definitions of "violent felony" and "serious drug offense" in 18 U.S.C. § 924(e)(2) are not identical to the definitions of "crime of violence" and "controlled substance offense" used in §4B1.1 (Career Offender)[.]"). Section 924(e)(2)(A)(ii) includes an explicit statutory reference limiting controlled substances in state law offenses to federally controlled substances; significantly, §4B1.2 does not. *See* 18 U.S.C. § 924(e)(2)(A)(ii) ("an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. § 802)), for which a maximum term of imprisonment of ten years or more is prescribed.").

Massachusetts of which the government is aware involving Ioflupane.  Thus, the categorical analysis arguably fails Defendant from the outset.

Even if Massachusetts criminalizes Ioflupane, the overbreadth of the state law is immaterial.  Defendant can point to no First Circuit authority squarely supporting the position he asks the Court to take in this case.  In his objections, Defendant cites principally to *United States v. Abdulaziz*, 988 F.3d 519 (1st Cir. 2021), suggesting that *Abdulaziz* stands for the proposition that a state conviction for distribution of a controlled substance is *categorically* not a "controlled substance offense" under the Guidelines if the definition of that controlled substance in the federal drug schedules becomes narrower before sentencing.  However, *Abdulaziz* is not as analogous as Defendant would have it be.  The question whether the CSA in fact controls what "controlled substances" satisfy USSG §4B1.2(b) was not before the First Circuit in *Abdulaziz*.[5]  Hence, that decision is not controlling, or even particularly instructive, here.  *See Lewis*, 58 F. 4th at 771-73, *Dubois*, 94 F. 4th at 1298, and *United States v. Jackson*, 55 F. 4th 846, 856 n.7 (11th Cir. 2022) (all distinguishing or declining to follow *Abdulaziz*).

Finally, Defendant also cites two district court sentencings: *United States v. Rise,* Crim. No. 17-10146-MLW (D. Mass. Oct. 17, 2022) and *United States v. Jimenez*, Crim. No. 21-40022-TSH (D. Mass. Feb. 6, 2023).  Neither one meaningfully advances Defendant's arguments.  *Rise* addressed the status of a predicate offense under the Armed Career Criminal Act.  Thus, both the reasoning in *Rise* concerning statutory interpretation and its holding are inapposite to the issues germane to this case.  *See, e.g., Chaires,* 2023 WL 8461231, at *6-*7 (Sullivan, J., concurring) (explaining why reliance upon the Armed Career Criminal Act's categorical approach is not

---

[5] In *Abdulaziz*, 998 F.3d at 523 & n.2, the government belatedly filed a post-briefing letter in which it made the same argument that it advances here, namely, that the term "controlled substance" does not refer exclusively to controlled substances listed in the CSA's drug schedules.  However, the First Circuit found that the government had waived the argument and did not consider it.

warranted when interpreting the Guidelines term "controlled substance offense," pursuant to USSG §4B1.2(b)). Concededly, *Jimenez* confronted more directly the issues presented here and ruled in favor of the defendant. But even in *Jimenez*, the district court did not consider the plain meaning of USSG §4B1.2(b), nor did it have the benefit of considering subsequent appellate court decisions approving a textual interpretation of "controlled substance" as one regulated by either federal or state law. *See* D.E. 98, Exhibit M at pp 6-14; *see also Dubois*, 94 F. 4th at 1296 (decided after *Jimenez*); *Jones*, 81 F. 4th at 598 (same); *Lewis*, 58 F. 4th at 769 (decided about the same time as *Jimenez*, not referenced during sentencing). Accordingly, the Court should not be moved by the *Jimenez* decision.

> B.  *The gun and ammunition were present and in close proximity to drugs, cash, and drug paraphernalia in Defendant's drug trafficking base of operations (Objections #6, #7, and #8)*

The Sentencing Commission's concerns regarding the intersection of gun possession and drug trafficking are expressed in specific offenses characteristics in both Guidelines Sections 2D1.1 and 2K2.1. *See, e.g.*, USSG §2D1.1, comment. (n.11(A)) ("The enhancement for weapon possession in subsection (b)(1) reflects the increased danger of violence when drug traffickers possess weapons."). These enhancements are intended to apply broadly where drug traffickers like Defendant involve guns in their criminal activity. Defendant's conduct here falls squarely in the heartland of cases covered by USSG §2D1.1(b)(1) and USSG §2K2.1(b)(6)(B).

The offense level enhancement under USSG §2D1.1(b)(1) is particularly sweeping. While "a certain nexus between the weapon and the offense must be shown," the First Circuit has "consistently honored the Commission's advisory" that "the adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." *United States v. McDonald*, 121 F. 3d 7, 9–10 (1st Cir. 1997), citing USSG §2D1.1(b)(1), comment. (n.3). Therefore, a defendant's constructive possession of a weapon can

trigger the enhancement. *Id*. at 10. Indeed, a defendant need not possess a weapon at all if it was reasonably foreseeable that another participant in the drug trafficking activity would be armed. *See United States v. Coleman*, 854 F. 3d 81, 85-86 (1st Cir. 2017). And the weapon need not even have been used in perpetrating the crime. *See McDonald*, 121 F. 3d at 10. The nexus is satisfied simply "when the weapon's location makes it readily available to protect either the participants themselves during the commission of the illegal activity or the drugs and cash involved in the drug business." *United States v. Corcimiglia,* 967 F. 2d 724, 727 (1st Cir. 1992); accord *United States v. Lagasse,* 87 F. 3d 18, 22 (1st Cir. 1996); *United States v. Ovalle-Marquez,* 36 F. 3d 212, 225 (1st Cir. 1994).

The First Circuit has recognized the "obvious" association between guns and drugs. *Corcimiglia*, 967 F. 2d at 727; *see United States v. James*, 803 Fed. Appx. 412, 415-16 (1st Cir. 2020) (upholding enhancement where trial court found guns were "part and parcel of the drug operation"); *United States v. Bianco*, 922 F. 2d 910, 912 (1st Cir. 1991) (explaining that "firearms are common tools" in drug-trafficking schemes). In this vein, and tracking the Commission's commentary, the First Circuit has distinguished drug trafficking offenses from other types of crimes under USSG §2K2.1(b)(6)(B). When determining whether a firearm or ammunition was "used or possessed in connection with another felony offense," generally, the enhancement should be applied only when "the firearm or ammunition facilitated, or had the potential of facilitating," the other offense. USSG §2K2.1(b)(6)(B), comment. (n.14(A)). But in cases when the other offense is drug trafficking, the enhancement is "automatic" as long as the sentencing court finds that "a firearm is found in close proximity to drugs, drug-manufacturing materials, or drug paraphernalia." *United States v. Tirado-Nieves*, 982 F. 3d 1, 8–10 (1st Cir. 2020); USSG §2K2.1(b)(6)(B), comment. (n.14(B)).

In arguing that the gun in his apartment was not connected to his drug offenses, Defendant gives a favorable spin to the facts.  In particular, he places significant emphasis on the fact that a bullet was not loaded in the chamber of the gun.  *See* PSR at pp. 37, 39, 40 (Objections #4, #6, and #7).  The government does not endorse Probation's revision of the PSR to reflect Defendant's uncorroborated claim that the magazine with ammunition was only partially inserted into the gun handle.  Nevertheless, even if true, it is a distinction without significance.[6]  The undisputed facts remain that the gun was functional, the ammunition was live and designed for use in the gun, and the magazine with loaded ammunition was attached to the gun such that the gun could have been readily discharged.  *See United States v. Sturtevant*, 62 F. 3d 33, 34 (1st Cir. 1995) (per curiam) ("[T]he presence of a readily available weapon in a location containing drugs" was "enough" to apply enhancement under USSG §2K2.1(b)(6)(B)).  Defendant's assertion that the gun "was not . . . ready to fire" is unsupported and simply semantics.  PSR at p 37 (Objection #4).

Defendant pleaded guilty to not just any drug offenses but drug distribution offenses, and that element looms large in the analysis of proximity.  *See United States v. Pritchett,* 2021 WL 6071502, at *3 (6th Cir. Dec. 20, 2021) (holding that it is "easier to see how a firearm facilitates drug trafficking transactions, than it is to see how a firearm facilitates the mere possession of controlled substances"); USSG §2L1.2, comment. (n.2).  Defendant suggests the rather brazen idea that the gun was not close enough to the drugs, cash, and drugs paraphernalia to be "connected" to his drug trafficking, *see* PSR at pp 39, 40 (Objections #6, #7), but its presence in the Quincy apartment is the crucial factor in the context of Defendant's drug trafficking activity, and his

---

[6] In light of definitions codified in both federal and state law, the gun could still be considered "loaded."  *See* 49 USC § 46505(a) ("In this section, 'loaded firearm' means a starter gun or a weapon designed or converted to expel a projectile through an explosive, that has a cartridge, a detonator, or powder in the chamber, magazine, cylinder, or clip."); M.G.L. C. 269, § 10(o) ("For purposes of this section, 'loaded' shall mean that ammunition is contained in the weapon or within a feeding device attached thereto.").

attempts to parse proximity within the apartment are undermined by the weight of authority and commonsense. *See, e.g., United States v. Panetom*, 661 F. 3d 709, 717 (1st Cir. 2011) (gun and cocaine in "same small single-floor apartment"); *United States v. Ennenga*, 263 F. 3d 499, 504 (6th Cir. 2001) (gun facilitated drug trafficking by protecting "a large and valuable stash of drugs" in house). Drugs and drug paraphernalia were found throughout the apartment, including in Defendant's bedroom with the gun. *See Tirado-Nieves*, 982 F. 3d at 9–10 (presence of drug paraphernalia and guns in same bedroom justified application of USSG §2K2.1(b)(6)(B) enhancement). Moreover, the evidence demonstrates that Defendant used the apartment as a base of operations. This is another meaningful aspect of the case supporting the nexus between the gun and Defendant's drug trafficking activity, and application of the firearm enhancements under both Guidelines. *See McDonald*, 121 F. 3d at 10 (USSG §2D1.1(b)(1) enhancement applicable where gun found hidden in bathroom vanity in apartment used by the defendant as "command post" for drug trafficking activities).

## DISCUSSION

A substantial sentence of imprisonment is warranted in this case due to the seriousness of the offense conduct and Defendant's lengthy and concerning criminal history. The proliferation of dangerous drugs in the community and illegal weapons possession each represent major threats to public safety by themselves. Armed drug traffickers, however, are a particularly egregious danger; recidivist armed drug traffickers like Defendant, even more so. Defendant has led a life of lawlessness and demonstrated an unrelenting criminal propensity. These gun and drug crimes are not his first. By all accounts, Defendant's disregard for others and the law was shaped by undeserved childhood hardships, and those impacts are a mitigating factor that the Court must weigh. On the other side of the scale rests public safety, eclipsed by the inescapable fact that

Defendant has once again returned to criminal activity of the most dangerous order.  Accordingly, a sentence of 151 months imprisonment, to be followed by 36 months supervised release, best satisfies the public's needs for justice and protection while accounting for Defendant's individualized circumstances and the statutory goals of sentencing.  *See* 18 U.S.C. § 3553(a).

*NATURE AND CIRCUMSTANCES OF THE OFFENSE*

Trafficking dangerous and addictive drugs is a crime with many victims, although there are typically few spokespersons for the misery it causes.  Besides the drug users themselves, spouses, significant others, children, relatives, friends, employers, and communities as a whole all feel the sting of illegal drugs in their midst, both in the effects drug use has on individuals and the impact that drug dealing – specifically, the other crimes and violence that drug dealing has been shown to breed – has on the quality of life.

Courts in the First Circuit have acknowledged the dangers that drug distribution poses to the community, and their relevance when fashioning a reasonable sentence under 18 U.S.C. § 3553(a).  *See United States v. Espinal-Almeida*, 699 F. 3d 588, 620 (1st Cir. 2012); *United States v. Pulido*, 566 F. 3d 52, 64 (1st Cir. 2009).  Here, Defendant stands convicted of possession with intent to distribute cocaine and fentanyl in this District.  The supply and circulation of dangerous and addictive narcotics like these is a source of tremendous harm to society.  Defendant's crimes are especially pernicious because he was trafficking a mixture of cocaine and fentanyl.

The extraordinary dangers posed by fentanyl are now well documented.  A mere two milligrams of fentanyl can be lethal depending on a person's body size, tolerance, and past usage.[7] According to the Centers for Disease Control and Prevention, overdose deaths from opioids

---

[7] U.S. Drug Enforcement Administration (DEA), *Facts About Fentanyl* (available at https://www.dea.gov/resources/facts-about-fentanyl) (last accessed May 19, 2024).

increased dramatically between 2013 and 2021, primarily driven by illicitly manufactured fentanyl, including fentanyl analogs.[8]   Consistent with overdose death data, the trafficking, distribution, and misuse of illicitly produced fentanyl and fentanyl analogs positively correlates with the escalation in overdose fatalities.[9]   The likelihood of a fatal interaction increases when other drugs like cocaine are mixed with fentanyl.[10]   And because of its potency and low cost, fentanyl has become a common contaminate in substances introduced into the community by drug dealers.[11]

Of course, drugs were not the only deadly contraband in Defendant's possession. Defendant defended his drug trafficking operation with a Ruger .380 semi-automatic pistol and ammunition at the ready.   The grave threat that the illegal use of firearms poses to everyday Americans can hardly be questioned.   Research demonstrates that greater access to illegal firearms makes death a more likely outcome of an assault or conflict.[12]   Specifically, according to federal crime data from 2011, most homicides in the United States were committed with firearms, especially handguns.[13]   And between 1980 and 2008, over 90 percent of gang-related homicides and 60 percent of felonies involved a firearm.[14]

---

[8] There were greater than 258,000 overdose deaths during that time period.  DEA, *Fentanyl Drug Fact Sheet* (October 2022), citing Centers for Disease Control and Prevention (available at https://www.dea.gov/sites/default/files/2023-06/Fentanyl%202022%20Drug%20Fact%20Sheet-update.pdf) (last accessed May 19, 2024).

[9] *Id.*

[10] DEA, *Facts about Fentanyl*.

[11] *Id.*; *see also* Lorvick J, Hemberg J, George M, Piontak J, Comfort M. "Just another thing for me to stress off of": Responses to unintentional fentanyl use in a community-based study of people who use opioids" (Research Square, April 2023) (available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10168448/#R1) (last accessed May 19, 2024).

[12] David M. Hureau & Anthony A. Braga, *The Trade in Tools: The Market for Illicit Guns in High-Risk Networks* (CRIMINOLOGY, vol. 56 iss. 3, July 18, 2018) (available at https://onlinelibrary.wiley.com/doi/full/10.1111/1745-9125.12187) (last accessed May 19, 2024).

[13] *Gun Violence in America*, National Institute of Justice (February 26, 2019) (available at https://nij.ojp.gov/topics/articles/gun-violence-america [archived]) (last accessed May 19, 2024).

[14] *Id.*

Defendant's illegal possession of a gun is a significant aggravating factor and should disturb the Court.  He has proven himself to be willing and capable of using a gun to harm others in the past.  *See* PSR at ¶ 44.  Moreover, the genesis of this case should not be overlooked. Investigators were concerned by Defendant's online statements to a Boston gang member suggesting that Defendant might "pop out on you over there by boyston [*sic*] street we're [*sic*] you live".  PSR at ¶ 9.  While engaged in drug trafficking activity, Defendant illegally kept the gun and ammunition together with significant amounts of cash and drugs.  Defendant does not deserve the benefit of the doubt, and his intent cannot be underestimated.  The only conclusion that the Court may fairly draw from this constellation of facts is that Defendant consciously armed himself in anticipation of resolving conflict with criminality and deadly force.

This specter of potentially devastating violence and the consequences for the community make Defendant's offenses extremely severe, worthy of the government's recommended Guidelines sentence, and consistent with the Court's obligation to impose a sentence that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment.  18 U.S.C. § 3553(a)(2)(A).

*HISTORY AND CHARACTERISTICS OF DEFENDANT*

The government's recommended sentence is also justified by the Defendant's criminal history, which informs the need for the sentence imposed to deter Defendant and protect the public from further crimes of Defendant.  18 U.S.C. § 3553(a)(2)(B), (C).

Since an early age, Defendant has demonstrated an utter disregard for the wellbeing of others and no inclination to conform his conduct to the requirements of law.  Defendant's arrest record begins in 2004 at 18 years old.  PSR at ¶ 52.  By 19 years old, Defendant suffered his first convictions: larceny from a person (two separate incidents), resisting arrest, and possession of

Class A with intent to distribute.  PSR at ¶¶ 38, 39.  Defendant was in and out of jail following violations of probation, and during this time he even committed crimes while in custody.  *See id*., PSR at ¶ 43 (vandalize property).  Not long afterwards, Defendant was sentenced to his first significant term of imprisonment: two-and-a-half years in the 2008 drug case in Essex Superior Court, which serves as a predicate "controlled substance offense" under the Guidelines.  PSR at ¶ 41.

Defendant had not returned to the community for long when he was arrested again on November 8, 2011.  *See* PSR at 44.  That day, at about 10:30 p.m., Defendant stepped out of the passenger seat of a car in front of a Jamaica Plain residence and fired several shots at two victims standing on the front porch.  *See* Exhibit 5 (Memorandum and Order on Defendant's Motion to Suppress, Commonwealth v. Rey Fulcar, 1284CR10101) at 2.  One of the victims was struck, and police found him inside the home bleeding profusely from a gunshot wound to his face.  *Id*.  Meanwhile, Defendant was located nearby and arrested in possession of the gun.  *Id*. at 4.  Defendant pleaded guilty and was sentenced to a term of imprisonment between five years and five years and one day.  He was in custody from the date of arrest until June 16, 2016.  PSR at ¶ 44.

In March 2017, a Suffolk County grand jury indicted Defendant for several serious criminal offenses involving a firearm, including armed robbery and assault and battery with a dangerous weapon causing serious bodily injury, that had allegedly occurred in January 2017.  *See* PSR at ¶ 57; Ex. 6 (Docket 1784CR00177, Commonwealth v. Rey David Fulcar) at pp 1-2.  Defendant was tried twice by the Commonwealth in those proceedings – first in October and November 2018, and then in January and February 2023 – and ultimately found not guilty of all charges.  *See* Ex. 6 at pp 12, 30.  Defendant was held in custody for about three years, from on or about March 31,

2017 until on or about February 18, 2020, following a reduction in bail.  *Id*. at 17.  Therefore, Defendant committed the instant offenses while subject to pre-trial conditions of release for the pending state case.  More specifically, in less than a year following his release from custody and while still on pre-trial conditions of release, Defendant resumed drug trafficking to the drug customer identified in this case.  Defendant also illegally received and possessed the gun and ammunition recovered in this case while on pre-trial conditions of release in the state prosecution.

The foregoing abbreviated recitation of Defendant's criminal history highlights the alarming and recurring theme: Defendant has spent most of his adult life in custody because he consistently returns to a life of crime when he is granted liberty.  In other words, at the age of 38, Defendant is the quintessential criminal recidivist.  Repeated sanctions by the criminal justice system have failed to impress upon Defendant the need for him to reform himself, and they have failed to deter him from further criminal conduct.  The long trail of danger and harm that Defendant has left in his wake gives the Court little choice but to impose a sentence of imprisonment meaningfully greater than the five-year sentence he last received in 2013, in order to adequately protect the public and punish and deter Defendant.  See 18 U.S.C. § 3553(a)(2)(A), (B).  The government's sentencing recommendation is necessary to accomplish those goals, and it represents a reasonable escalation of penalties.

The government recognizes the hardships in Defendant's childhood and the mitigating impact they have on his sentence.  PSR at ¶¶ 60-64.  Probation's investigation of Defendant's personal history reveals the ripple effects of those traumas that affect Defendant in his adult life, such as substance use, anger issues, and educational deficits.  PSR at ¶¶ 73-79.  Those early life hardships and the resulting lack of opportunities undoubtedly contributed to Defendant's journey into the criminal justice system and the subsequent cycles of incarceration and crime.  However,

Defendant's past can only explain his repeated commission of very dangerous and harmful crimes so much, and it certainly does not excuse them.

A counterweight to the mitigating factors in Defendant's personal history is Defendant's seeming unwillingness or inability to truly rehabilitate.  During prior periods of incarceration and freedom, Defendant has at times sought and maintained employment, and attempted to improve himself.  *See* PSR at ¶ 44, 79-80.  It is difficult to view these actions as more than half-measures, though, because Defendant continued to harm others, disregard the law and authority, and maintain one foot in the criminal world.  *See, e.g.*, PSR at ¶¶ 44-45, 50.  Of course, under Section 3553(a), the Court must also consider public safety, and without real rehabilitation there appears to be a prohibitive risk that Defendant's demons will continue to undermine his attempts to live a law-abiding life when he returns to the community.  18 U.S.C. § 3553(a)(2)(C).

Defendant's sentencing submissions include information concerning his mental health, *see* D.E. 98, Exhibit B (under seal), and they suggest a possible pathway towards real rehabilitation.  Defendant's rehabilitation is another important element in the Court's sentencing equation.  18 U.S.C. § 3553(a)(2)(D).  Under the First Step Act, the Bureau of Prisons now provides at all facilities mental health treatment programs designed to aid inmates' successful re-entries into their communities, categorized as Evidence-Based Recidivism Reduction programs. Opportunities to participate in various cognitive processing therapies – including dialectical behavior therapy, emotional self-regulation programs, and criminal thinking treatment groups – will be available to Defendant while serving a custodial sentence.  BOP also provides 500-hour occupational education programs that may help Defendant acquire valuable vocational and educational skills that he is currently lacking.  Accordingly, Defendant stands to benefit from long-term participation in BOP programming, and society stands to benefit from Defendant's

rehabilitation opportunities that a lengthy term of imprisonment will allow.  In this way, the government's recommended sentence again furthers the statutory goals of sentencing.

Finally, the government notes that its Guidelines sentencing recommendation of 151 months is about 20 percent higher than the top of Defendant's Guidelines sentencing range before application of the Career Offender Guideline.  Based on a total offense level of 25 and assignment to Criminal History Category V, that range would be 100 – 125 months.  *See* PSR at ¶¶ 25, 33-34, 47.  According to data compiled by the Sentencing Commission in the last several years, the median sentence of imprisonment imposed on defendants with the same offense level and criminal history category as calculated by Probation is 104 months.  PSR at ¶ 103.  A higher sentence is warranted for Defendant because of the particular harmfulness and dangerousness of his crimes, as described herein, and the pace and intensity of his recidivism, *i.e.*, the fact that Defendant has reoffended so quickly when released into the community in the past, often while being supervised by the court.

## CONCLUSION

For all the foregoing reasons, the government respectfully recommends that the Court sentence Defendant to a term of imprisonment of 151 months, to be followed by 36 months of supervised release.  Such a sentence is sufficient but not greater than necessary to reflect the seriousness of Defendant's offenses, to promote respect for the law, to provide just punishment for the offenses, to afford adequate deterrence to the criminal conduct, to protect the public from further crimes of Defendant, and to provide opportunity for rehabilitation in the most effective manner.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By:   *Fred M. Wyshak, III*
      FRED M. WYSHAK, III
      JOHN T. DAWLEY, Jr.
      Assistant U.S. Attorneys

Date:  May 20, 2024

CERTIFICATE OF SERVICE

I, Fred M. Wyshak, III, Assistant United States Attorney, do hereby certify that this document, filed through the Electronic Case Filing system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and that paper copies will be sent to those indicated as nonregistered participants on May 20, 2024.

*Fred M. Wyshak, III*
FRED M. WYSHAK, III
Assistant U.S. Attorney